**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

ALPER HOLDINGS USA, et al.

Debtors.

Chapter:   11

Case No.:   07-12148 (BRL)
Jointly Administered

**MEMORANDUM DECISION AND ORDER ON OBJECTION
OF ALPER HOLDINGS USA, INC. TO PROOFS OF
CLAIM (CLAIM NOS. 5, 6, 7, 8, 9, 10) FILED BY
<u>SCHRADER-BRIDGEPORT INTERNATIONAL, INC.</u>**

Alper Holdings USA, Inc. ("Alper"), the debtor, seeks entry of an order (the "Objection") disallowing and expunging proofs of claim numbers 5, 6, 7, 8, 9, and 10 (the "Schrader Claims") filed by Schrader-Bridgeport International, Inc. f/k/a Schrader Automotive, Inc. ("Schrader"), pursuant to *inter alia* section 502(e)(1)(B) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In the alternative, to the extent section 502(e)(1)(B) of the Bankruptcy Code does not act as a bar to the Schrader Claims, Alper seeks to have the Schrader Claims estimated pursuant to section 502(c) of the Bankruptcy Code. Schrader, which seeks indemnification from Alper for undetermined amounts based upon the indemnity provisions of a purchase agreement and guaranty, opposes the Objection.

This bankruptcy proceeding is one of several that *inter alia* touch on environmentally distressed property in Dickson County, Tennessee.[1] For the reasons set forth below and at oral argument, the Court finds the portion of the Schrader Claims asserting amounts claimed for legal fees and expenses already incurred in defending the Dickson Actions (as defined below) to be not contingent, and therefore, outside the scope of Bankruptcy Code section 502(e)(1)(B). As

---

[1] For example, the 2004 chapter 11 reorganization of Saltire Industrial, Inc. ("Saltire") was the subject of a previous order of confirmation dated March 8, 2006. *See In re Saltire Industrial, Inc.*, Case No. 04-15389 (BRL) (Bankr. S.D.N.Y. 2004) [docket no. 227].

section 502(e)(1)(B) is inapplicable to those legal fees and expenses, the Objection is overruled to the extent that they be found to be reasonable after a further hearing to be scheduled. As to any amounts asserted beyond those reasonable defense costs and expenses, however, the Court finds that section 502(e)(1)(B) does act as a bar to those claims and they are, therefore, disallowed. Accordingly, the Objection is granted in part and denied in part.

## BACKGROUND

**The Transfer and Purchase Agreements**

The Schrader Claims arise in connection with groundwater contamination and environmental issues that arose as far back as the mid-1960's in Dickson County that were allegedly caused, in part, by Saltire, an incidental subsidiary of Alper. From approximately 1964 until March 1985, Saltire operated a plant in Dickson County (the "Dickson Plant") where it made automotive tire valves and associated products and where trichloroethylene ("TCE") was used as a degreaser. The Dickson Plant ceased operations in March 1985.

In October 1985, once allegations of TCE contamination began to surface and the Dickson Plant closed, Saltire[2] made the decision to spin-off its automotive tire valve business, which was then known as the Schrader Automotive division. To accomplish this divestiture, Saltire transferred all of the assets and liabilities of the Schrader Automotive division to the newly incorporated Schrader Automotive, Inc. ("SAI") pursuant to a transfer agreement dated October 28, 1985 (the "Transfer Agreement"). Schrader is the successor of SAI.

Under the terms of the Transfer Agreement, SAI purchased all of the assets that comprised the Schrader Automotive division subject to all of its pending obligations and liabilities. In addition, under the terms of the Transfer Agreement, SAI agreed to indemnify

---

[2]     Saltire has also been known at various points throughout its existence as Scovill or Scovill Manufacturing, Inc.

- 2 -

Saltire "from and against, any and all liabilities, obligations, commitment and undertakings, fixed or contingent, disclosed or undisclosed, and known or unknown, of Scovill relating to the [Schrader Automotive Division's] business." *See* Transfer Agreement, at § 3.

In March 1986, however, ArvinMeritor, Inc.[3] ("ArvinMeritor") entered into an agreement with Saltire to purchase newly spun-off SAI (the "Purchase Agreement"). The Purchase Agreement attempted to disclaim any liability on the part of ArvinMeritor relating to Dickson County by expressly affirming that SAI was not the owner of the Dickson Plant and that ArvinMeritor would not be assuming any liabilities relating to the operation of the Dickson Plant. Specifically, Section 2.20 of the Purchase Agreement stated as follows:

> As of the Closing Date, the Company [SAI] and the Company Subsidiaries will not own, and the Balance will not include the Dickson, Tennessee plant formerly operated by the Schrader Automotive Division, and, in any event, Buyer [ArvinMeritor] is not assuming any liability or obligation arising out of or relating to the business and operations of the Dickson, Tennessee plant of the Schrader Automotive Division, and all liabilities (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, secured or unsecured) associated with the Dickson, Tennessee plant.

Purchase Agreement, at § 2.20.

Additionally, the Purchase Agreement also attempted to reverse or "unwind" the indemnity obligations that ran from SAI (Schrader) to Saltire under the Transfer Agreement. Under the Purchase Agreement, Saltire – as opposed to SAI – would now be required to indemnify ArvinMeritor and SAI (Schrader) for any costs and expenses arising out of events that

---

[3] At the time of purchase, the actual entities that entered into the Purchase Agreement were Arvin Industries, Inc. (which merged with Meritor Automotive, Inc. in July 2000 to become ArvinMeritor) and Scovill, Inc.

occurred prior to closing.[4] Specifically, section 4.2 of the Purchase Agreement provided as follows:

> Seller [Saltire] shall indemnify and hold harmless Buyer [ArvinMeritor],…, from, against and in respect of any and all damages, deficiencies, costs, expenses or losses resulting from…(ii) any lawsuit, action, administrative or arbitration or other proceeding or governmental investigation pending on the date hereof or arising out of events occurring on or prior to the Closing Date to the extent not reserved against on the Closing Balance Sheet….

Purchase Agreement, at § 4.2.

Saltire's indemnification obligations were guaranteed by its then parent company, First City, Industries, Inc. ("First City"), by execution of a separate guaranty agreement dated March 1986 (the "Guaranty," and together with section 4.2 of the Purchase Agreement, the "Indemnity Provisions").[5]

Subsequently thereafter, First City filed for bankruptcy protection. In accordance with First City's pre-packaged chapter 11 plan of reorganization, Alper received shares of stock as a stock-for-debt distribution in reorganized First City on account of its allowed claim.

---

[4] In a further attempt to "unwind" SAI's (Schrader's) original indemnity obligation, Saltire and SAI entered into an amendment to the Transfer Agreement in March 1986, where, *inter alia*, Saltire unconditionally released SAI's indemnity obligation. *See* First Amendment to Transfer Agreement, at § 1.

[5] Section 1 of the Guaranty provided, in pertinent part, that:

> Guarantor [First City] hereby absolutely and unconditionally guarantees to each of the Indemnified Parties (as defined in Section 4.2 of the Purchase Agreement) the full and punctual payment and performance in accordance with their respective terms of all indemnification obligations of Seller [Saltire] and Old Scovill under or arising out of the Purchase Agreement, as and when due….

Guaranty, at § 1.

Accordingly, as an incidental consequence of First City's bankruptcy, Alper became the parent of Saltire in 1992 and assumed the obligations of First City under the Guaranty.

**The Dickson Actions**

In 2004 and 2005, multiple groups of defendants commenced separate actions against, among others, Alper, Saltire, Schrader and ArvinMeritor, alleging damages from environmental contamination resulting from the disposal of toxic waste at the Dickson Plant.[6] While each of the complaints filed by the plaintiffs in the Dickson Actions (the "Dickson Plaintiffs") assert a litany of claims and allegations against the generally pled "defendants" at large, including claims for negligence, negligence per se, and strict liability, the complaints contain merely one allegation specifically directed at Schrader: "Schrader-Bridgeport International, Inc. is formerly known as, and is the successor in interest to, Schrader Automotive, Inc. Schrader Automotive, Inc. was formerly known as the Schrader Automotive Group which was the Scovill, Inc. division that operated the Facility during the relevant time period." *See, i.e.*, Amended Complaint of the Adkins Plaintiffs dated January 11, 2006, at ¶ 14. In similar fashion, the complaints allege merely the following against Alper: "Alper Holdings U.S.A., Inc. is the successor in interest to Scovill, Inc. and Saltire Industrial, Inc. Alper Holdings U.S.A., Inc. is also sued herein for its own direct acts and omissions." *See, e.g.*, Amended Complaint of Adkins Plaintiffs, at ¶ 6.

In large part to deal with the liabilities related to the Dickson Plant that loomed on the horizon, Saltire filed a voluntary petition for relief in this Court under chapter 11 of the

---

[6] The Dickson Actions are *Flake v. Saltire Industrial, Inc., et al.*, Dickson County Circuit Court, Case No. CV-1911; *Armstrong v. Saltire Industrial, Inc., et al.*, Dickson County Circuit Court, Case No. CV-1929; and *Adkins, et al. v. Schrader-Bridgeport Int'l, Inc., et al.*, Dickson County Circuit Court, Case No. CV-2022. In addition to the Dickson Actions, there are three other actions filed in Dickson County relating to the Dickson Plant in which Alper, but not ArvinMeritor, was named as a defendant: *Harry Holt, et al. v. Scovill, Inc., et al.*, Dickson County Circuit Court, Case No. CV-1882; *Dunbar v. Saltire Industrial, et al.*, Dickson County Circuit Court, Case No. CV-1982; and *Lavenia Holt, et al. v. Scovill, Inc., et al.*, Dickson County Circuit Court, Case No. CV-1977.

- 5 -

Bankruptcy Code on August 17, 2004.[7] It is worth noting that Schrader did not filed a proof of claim in Saltire's bankruptcy for amounts owed under the Indemnity Provisions or otherwise.[8]

On January 13, 2006, Schrader first notified Alper of its obligations under the Guarantee and asserted that Alper was obligated to indemnify it for any potential liabilities incurred in connection with the Dickson Actions. On or about February 27, 2007, Schrader filed a complaint against Alper in the Superior Court for the State of Delaware (the "Superior State Court Action") seeking, among other things, a declaratory judgment of Alper's indemnification obligations.

**Alper's Bankruptcy Filing**

On July 13, 2007 (the "Petition Date"), Alper commenced its own chapter 11 case before this Court in part to obtain a timely resolution of the claims asserted against it relating to the Dickson Plant. As a result of Alper's bankruptcy filing, the Dickson Actions were stayed in accordance with section 362 of the Bankruptcy Code as they pertained to Alper. Accordingly, on July 18, 2007, five days after Alper commenced its bankruptcy case, the Dickson Plaintiffs dismissed Alper as a defendant in each of the Dickson Actions.

On or about September 19, 2007, Schrader filed the Schrader Claims in Alper's bankruptcy proceeding asserting claims for undetermined amounts arising under the Indemnity Provisions of the Purchase Agreement and Guaranty. The Schrader Claims are primarily

---

[7]   *In re Saltire Industrial, Inc.*, Case No. 04-15389 (BRL) (Bankr. S.D.N.Y. 2004).

[8]   ArvinMeritor, however, did file a claim against Saltire for amounts owed pursuant to the Indemnity Provisions. On September 19, 2006, Saltire filed its Fourth Omnibus Objection seeking to disallow and expunge certain claims against the estate, including those of ArvinMeritor (the "Saltire Objection"), pursuant to section 502(e) of the Bankruptcy Code. ArvinMeritor contends that it did not oppose the Saltire Objection because it expected to receive only a small percentage of any allowed claim from Saltire, while Alper, on the other hand, was solvent and had absolutely and unconditionally guaranteed Saltire's obligations to ArvinMeritor under the Guaranty. Accordingly, this Court entered an order disallowing ArvinMeritor's claim in the Saltire bankruptcy.

comprised of three separate categories of claims: (1) defense costs and expenses previously incurred in defending the Dickson Actions; (2) future defense costs related to the Dickson Actions; and (3) indemnification for any liability resulting from the Dickson Actions.

Having dismissed Alper as a defendant in the Dickson Actions to enable them to proceed against Schrader and the other remaining defendants, the Dickson Plaintiffs also filed proofs of claim against Alper. Alper objected to those proofs of claim, asserting that it could not be held liable for any damages arising out of the Dickson County contamination as Alper had no connection or relationship to Saltire or Dickson County whatsoever prior to obtaining an indirect ownership interest in Saltire approximately two decades after the alleged contamination first occurred and at least seven years after the Dickson Plant was closed. This Court agreed, and in a series of opinions disallowing and expunging those claims, held that "Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire's alleged contamination or remediation in Dickson County, Tennessee." *See* Memorandum Decision and Order Granting Objection of Alper Holdings, Inc. to Proofs of Claim (Claim Nos. 20 and 21) Filed By Flake Plaintiffs dated January 15, 2008, at p. 12 (the "Flake Opinion"); Memorandum Decision and Order Granting Objections of Alper Holdings, Inc. to Proofs of Claim Filed By (i) Armstrong Plaintiffs, and (ii) Holt Plaintiffs dated February 25, 2008, at p. 12 (the "Armstrong/Holt Opinion"); Memorandum Decision and Order Granting Objection of Alper Holdings, Inc. to Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) Filed By Adkins Plaintiffs dated April 3, 2008, at p. 16 (the "Adkins Opinion").[9]

Having dealt with the claims of the Dickson Plaintiffs, Alper now turns its attention to Schrader's indemnity claims in the present Objection. In the Objection, Alper contends that the

---

[9] The Dickson Plaintiffs are currently in the process of appealing the decisions and orders of this Court denying and expunging their claims against Alper to the United States District Court for the Southern District of New York.

- 7 -

Schrader Claims should be disallowed and expunged under section 502(e)(1)(B) of the Bankruptcy Code as they are contingent claims for reimbursement or contribution from an entity that is co-liable with Alper. *See* Objection, at ¶¶ 25-35. In the event, however, that the Court declines to disallow the Schrader Claims, Alper contends the Court should estimate the Schrader Claims at Schrader's defense costs incurred to date pursuant to section 502(c)(1) of the Bankruptcy Code because (i) Alper will suffer undue harm in delaying its emergence from bankruptcy and (ii) the underlying claims asserted against Schrader in the Dickson Actions fail as a matter of law and will yield the Dickson Plaintiffs no recovery. *See* Objection, at ¶¶ 39-48.

On August 27, 2008, Schrader filed its response (the "Response") to the Objection asserting that Alper was absolutely and unconditionally obligated to indemnify Schrader for its defense of the Dickson Actions and that the Schrader Claims cannot be disallowed pursuant to section 502(e)(1)(B) because *inter alia* (i) this Court previously ruled that Alper has no liability relating to the Dickson Plant and, therefore, Alper and Schrader cannot be found co-liable as required under section 502(e)(1)(B), (ii) Tennessee has abolished the common law doctrine of joint and several liability and accordingly, Alper as a matter of law cannot be found co-liable on the same claims with Schrader, (iii) the policy rationale of section 502(e)(1)(B) to prevent "double dipping" does not apply in this instance as the claims of the Dickson Plaintiffs have previously been expunged, and (iv) even if section 502(e)(1)(B) were to apply, that portion of the Schrader Claims that covers indemnification for costs and expenses incurred defending the Dickson Action is not contingent as required under section 502(e)(1)(B). *See* Response, at ¶¶ 31-71. Finally, Schrader contends that the Court should not estimate the Schrader Claims pursuant to section 502(c) because Alper has failed to demonstrate that estimation of the

Schrader Claims is necessary to prevent undue delay in the administration of Alper's bankruptcy case.[10]  *See* Response, at ¶¶ 72-107.

## DISCUSSION

### I. Section 502(e)(1)(B)

Section 502(e)(1)(B) of the Bankruptcy Code states, in pertinent part, that:

> [T]he court shall disallow any claim for reimbursement or contribution of entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that—
>
> *******
> (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution….

11 U.S.C. § 502(e)(1)(B).  Accordingly, three elements must be established to disallow a claim pursuant to section 502(e)(1)(B).  "First, the claim must be for reimbursement or contribution.  Second, the party asserting the claim must be 'liable with the debtor' on the claim.  Third, the claim must be contingent at the time of its allowance or disallowance."  *In re GCO, LLC*, 324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005); *In re Drexel Burnham Lambert Group Inc.* ("Drexel II"), 148 B.R. 982, 985 (Bankr. S.D.N.Y. 1992).

As stated above, the Schrader Claims can be distilled into the separate categories: (1) defense costs and expenses previously incurred in defending the Dickson Actions; (2) future defense costs related to the Dickson Actions; and (3) indemnification for any liability resulting from the Dickson Actions.

As a first issue, courts have consistently held that "the concept of reimbursement includes indemnity."  *In re Wedtech Corp.*, 85 B.R. 285, 289 (Bankr. S.D.N.Y 1988); *see also In re GCO,*

---

[10]  The Dickson Plaintiffs filed a limited reply and appeared at the hearing in opposition to Schrader's Response, essentially agreeing with Alper that the Schrader Claims should be disallowed and expunged pursuant to 502(e)(1)(B). *See* Dickson Plaintiffs' Limited Response to Objection of Alper to Proofs of Claim (Claim Nos. 5, 6, 7, 8, 9, 10) Filed by Schrader dated August 22, 2008 [docket no. 259].

- 9 -

*LLC*, 324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005) (*citing Wedtech*, 85 B.R. at 289) ("Because 'the concept of reimbursement includes indemnity,' any claims for indemnification also fall within the scope of the first prong of § 502(e)(1)(B)."); *Drexel II,* 148 B.R. at 986. Accordingly, the Schrader Claims, which are based upon the Indemnity Provisions of the Purchase Agreement and Guaranty, satisfy the first prong of section 502(e)(1)(B).

Second, it is generally agreed that a claim is contingent "if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event." *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 580 (S.D.N.Y. 2001) (*citing Mazzeo v. United States* (*In re Mazzeo*)*,* 131 F.3d 295, 303 (2d Cir. 1997)); *see also In re GCO,* 324 B.R. at 466 ("A claim is contingent where it has not yet accrued and ... is dependent upon some future event that may never happen.") (internal quotations omitted); *Highland Holdings and Zito I, L.P. v. Century/ML Cable Venture*, 06-civ-181, 2007 WL 2405689, *5 (S.D.N.Y. Aug. 24, 2007); *In re Chase*, 372 B.R. 125, 132 (Bankr. S.D.N.Y. 2007) ("The Bankruptcy Code does not define the term 'contingent' but the court has stated that a claim is 'contingent' when the debtor's legal duty to pay it does not come into existence until triggered by the occurrence of a future event."). Moreover, "[t]he determination of whether the claim is contingent is made at the time of the allowance or disallowance of the claim, which courts have established is the date of the ruling." *Drexel II*, 148 B.R. at 986; *see also In re Baldwin-United Corp.,* 55 B.R. 885, 894-95 (Bankr. S.D. Ohio 1985) ("An objection on a § 502(e)(1) ground will trigger a hearing and ruling on the objection (*see,* Bankruptcy Rule 3007) and thus, the 'time of allowance or disallowance' will be the date of the ruling."); *In re APCO Liquidating Trust*, 370 B.R. 625, 636 (Bankr. D. Del. 2007); *In re GCO*, 324 B.R. at 466 (for contingency element of section 502(e)(1)(B) to be satisfied, "such contingency must exist on the date of the Court's ruling.").

A. Defense Costs and Expenses Previously Incurred

As to the first category of Schrader Claims – defense costs and expenses previously incurred in defending the Dickson Actions – Schrader claims that as of the Petition Date, it has incurred legal fees and expenses in defense of the Dickson Actions in the aggregate amount of $374,113.91, and that that amount has increased to over $560,000 to date. *See* Response, at ¶ 61. While the Court questions the attempts of Saltire, Schrader and ArvinMeritor to transfer liability for the Dickson Plant as to third parties back and forth by agreement seemingly at the parties' convenience, the parties clearly entered into a valid agreement for indemnification that is enforceable between and among them. Alper's duty to indemnify Schrader under the Guaranty is "absolute and unconditional" and the costs and expenses of defending the Dickson Actions are clearly encompassed by the indemnity language of section 4.2 of the Purchase Agreement. Accordingly, as the Indemnity Provisions are valid and enforceable, Alper is obligated under the Guaranty to indemnify Schrader for the reasonable fees, costs and expenses (including attorneys' fees, costs and expenses) incurred in defense of the Dickson Actions as of the date of this ruling. *See supra Drexel II*, 148 B.R. at 986.

As these fees and expenses have already been incurred and presumably billed, they are not dependent on some future triggering event or determination of liability. *See Pearl-Phil GMT (Far East) Ltd.*, 266 B.R. at 580; *see also In re Global Indus. Tech., Inc.*, 327 B.R. 230, 234 (Bankr. W.D. Pa. 2005) (finding that section 502(e)(1)(B) did not apply to indemnity claim for attorney's fees previously incurred where those fees "have already been incurred and billed and are therefore not contingent."). Accordingly, as these amounts are not contingent, section 502(e)(1)(B) is inapplicable and the Objection as to this first category of Schrader Claims is overruled. Notwithstanding the foregoing, Alper strongly and stridently opposes the reasonableness and appropriateness of the claimed defense costs. *See* Reply Memorandum of

Alper In Support of Objection to Proofs of Claim (Claim Nos. 5, 6, 7, 8, 9, 10) Filed by Schrader dated September 6, 2008, at ¶ 17.  Accordingly, a further hearing is required as to this portion of the requested indemnification.

### B. Future Defense Costs and Indemnification for Liability

As to the remaining two categories of Schrader Claims – future defense costs related to the Dickson Actions and indemnification for any liability resulting from the Dickson Actions – Alper has met its burden for disallowance under section 502(e)(1)(B).  As set forth above, these two categories of Schrader Claims clearly qualify as claims for "reimbursement or contribution" under section 502(e)(1)(B).  *See supra Wedtech*, 85 B.R. at 289.  In addition, both these classes of Schrader Claims are properly categorized as "contingent as of the time of allowance or disallowance" as the amounts and ultimate liability are presently unknown.  *See Drexel II*, 148 B.R. at 986-87, 991 (*inter alia*, disallowing indemnity claim for future defense costs finding "to the extent these Defense Costs are not determined and remain unpaid, they are contingent claims for indemnification of a party co-liable with the debtor and disallowed under § 502(e)(1)(B)."); *Wedtech*, 85 B.R. at 289 (disallowing contingent claims for reimbursement of attorney fees associated with underlying actions in which claimant was co-liable with debtor); *contra In re RNI Wind Down Corp.*, 369 B.R. 174, 182-87 (Bankr. D. Del. 2007) (which recognizes the Second Circuit jurisprudence on the subject but distinguishes that line of cases determining that claimant's undisputed right to pre-indemnification advancement of litigation related expenses rather than simple reimbursement removed any contingency under section 502(e)(1)(B) and gave rise to a direct claim against the debtor).  The only issue then is whether these categories of claims are types for which Alper and Schrader may be found "co-liable."

Contrary to Schrader's argument that Schrader cannot be co-liable with Alper because the Court previously disallowed the underlying claims of the Dickson Plaintiffs, the case law clearly

states that the proper standard for determining co-liability is whether "the causes of action in the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay." *In re GCO*, 324 B.R. at 465; *see also Wedtech*, 85 B.R. at 290; *Drexel II*, 148 B.R. at 986. "The co-liability factor is determined by reference to the underlying third party action. If the causes of action in the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay, then the co-liability factor is present." *In re Drexel Burnham Lambert Group, Inc.* ("Drexel I"), 146 B.R. 92, 102 (S.D.N.Y. 1992) (internal quotations omitted). The fact that this Court has had an opportunity to rule on Alper's liability to the Dickson Plaintiffs is of no consequence. The proper inquiry requires the Court to look to the underlying lawsuit to determine whether – absent the automatic stay – liability for the damages and injuries spewing from the Dickson Plant might have possibly been imposed on Alper. And at this time, the Court is not inclined to say such liability might not have been found. Moreover, the allegations as to co-liability remain pending in the Dickson Actions.

Furthermore, while safeguarding from possible "double recoveries" from the estate is a "principal purpose of the entire subsection of 502(e)," the purpose of section 502(e)(1)(B) is not so limited. *See Drexel II*, 148 B.R. at 988.

> This statute [section 502(e)(1)(B)] epitomizes a considered Congressional policy that underlies the Bankruptcy Code as a whole, and Chapter 11 in particular: that is, the bankrupt's estate should not be burdened by estimated claims contingent in nature. Rather, the debtor should be expeditiously rehabilitated and reorganized, thereby providing the bankrupt a fresh start, while simultaneously according fair treatment to creditors by paying ascertainable claims as quickly as possible.

*In re Charter Co.*, 862 F.2d 1500, 1502 (11th Cir. 1989); s*ee also Wedtech*, 85 B.R. at 289-90 ("[T]he purpose of disallowing contingent indemnity and contribution claims is precisely because they are so contingent."); *Drexel II*, 148 B.R. at 989 ("*Wedtech* and a number of other courts have viewed § 502(e)(1)(B) as having purposes that reach beyond the risk to the debtor of

- 13 -

double liability and are directed at the difficulty of administering and distributing the debtor's estate while ongoing contingent claims of the type covered by § 502(e)(1)(B) still exist."); *In re GCO*, 324 B.R. at 466-67 ("The purpose of § 502(e)(1)(B) is to prevent contingent, unresolved indemnification or contribution claims from delaying the consummation of a plan of reorganization or a final distribution in a liquidating case."). Accordingly, the fact that the possibility of "double dipping" has been removed does not remove the remaining Schrader Claims outside the purposes or reach of Section 502(e)(1)(B).

Similarly, Schrader's argument that it cannot be found co-liable with Alper under 502(e)(1)(B) because Tennessee law no longer recognizes the common law doctrine of joint and several liability is also without merit. The Dickson Plaintiffs have alleged that Alper is the alter-ego and successor-in-interest of Saltire and that Schrader is the successor-in-interest to Saltire. *See, e.g.*, Adkins Complaint, at ¶¶ 14, 17. In both instances, the Dickson Plaintiffs have alleged that both Schrader and Alper are responsible for the negligent actions of Saltire. These allegations stand in stark contrast to those asserted by the Dickson Plaintiffs against ArvinMeritor, which they have sued based upon its own "subsequent, independent negligent and grossly negligent conduct." *See* Objection, at ¶ 31. While the Court notes the lack of specific allegations set forth by the Dickson Plaintiffs as to either Alper or Schrader, clearly under these (broadly pled) theories of successor liability, Alper and Schrader could be found co-liable to the Dickson Plaintiffs in the Dickson Actions.

Finally, as to the portion of the Schrader Claims reserved for future defense costs and expenses, the Court finds these amounts to be inextricably associated with and contingent upon the underlying Dickson Actions. Alper's duty to pay these fees and expenses clearly has not yet been triggered. As such, the case law within the Second Circuit brings claims for these amounts squarely within the auspices of section 502(e)(1)(B). *See Drexel II*, 148 B.R. at 989 ("Section

- 14 -

502(e)(1)(B) applies to whatever contingent claims a co-debtor has which entitled him to be made whole for monies he has expended *on account of* a debt for which he and the debtor are both liable.") (emphasis in original, internal quotations omitted); *Wedtech*, 85 B.R. at 290-92 (*inter alia* disallowing claims for reimbursement of attorneys' fees); *contra In re RNI Wind Down Corp.*, 369 B.R. at 187-91. As was noted by the court in Drexel I:

> Appellant's attempt to segregate these cost-related claims from the underlying indemnity claims on the basis of co-liability ignores the fact that they are simply different facets of the same unified whole. The interdependence between appellant's defense costs and the underlying action for indemnification places all of appellant's claims under the umbrella of § 502(e)(1)(B), and thus all claims are disallowed under that subsection.

146 B.R. at 97.

Accordingly, as the remaining Schrader Claims for future defense costs and indemnification for any liability relating to the Dickson Actions satisfy all three elements of section 502(e)(1)(B) they are disallowed.

## III. Estimating the ArvinMeritor Claim

As the Court has held that the Schrader Claims are limited to reasonable fees, costs and expenses incurred as of the date of this ruling, the Court need not address Alper's argument that the Schrader's claim be estimated under section 502(c).

## **CONCLUSION**

For the reasons set forth above and at the hearing, the Objection is overruled as to the reasonable fees, costs and expenses incurred as of the date of this ruling by Schrader in defense of the Dickson Actions subject to a further hearing as to an allowable amount, but is granted as to any amounts asserted beyond those amounts pursuant to section 502(e)(1)(B). Accordingly, the Objection is granted in part and denied in part. The parties are directed to confer with chambers as to scheduling a further hearing.

IT IS SO ORDERED.

Dated: New York, New York
September 10, 2008

/s/Burton R. Lifland
Honorable Burton R. Lifland
United States Bankruptcy Judge